UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————————
                                                )
SARAH NATHREEN NAKANWAGI,                        )
                                                )
            Plaintiff,                          )
                                                )       Civil Action No.
      v.                                         )       23-10533-FDS
                                                )
EXECUTIVE OFFICE of the                          )
TRIAL COURT,                                     )
                                                )
            Defendant.                          )
———————————————————————)

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

SAYLOR, C.J.

      This is an action brought by plaintiff Sarah Nakanwagi against her former employer, the

Executive Office of the Massachusetts Trial Court, alleging workplace discrimination and

retaliation in violation of Title VII, 42 U.S.C. § 2000e, *et seq.* The complaint alleges that

Nakanwagi was a victim of sexual harassment and discrimination in the workplace, and that the

Executive Office (1) failed to protect her from a hostile environment and (2) retaliated against

her for filing complaints about the alleged mistreatment. She is proceeding *pro se*.

      Defendant has moved for summary judgment, asserting that there is insufficient evidence

in the record to support plaintiff's discrimination and retaliation claims. Plaintiff did not file an

opposition to the motion; did not submit any affidavits or other evidence in opposition; and did

not file a concise statement of material facts in dispute, as required by Local Rule 56.1.

      For the following reasons, the motion will be granted.

## I.    Background

Except where otherwise noted, the following facts are undisputed.

### A.    Factual Background

#### 1.    Parties

At the relevant time, Sarah Nakanwagi lived in Massachusetts and was an employee of The Executive Office of the Trial Court, where she worked briefly at the Brighton Division of the Boston Municipal Court ("BMC") in 2021 before being terminated.  (Nakanwagi Dep. at 45; Donovan Aff. ¶¶ 7, 18).  She was born in Uganda and moved to the United States in 2014.  (Nakanwagi Dep. at 25-26).

The Executive Office of the Trial Court oversees the operations of the Massachusetts trial-court system.  (Donovan Aff. ¶ 2).  It comprises seven departments, one of which is the BMC.  (*Id.*).  The BMC, in turn, has eight court divisions—including one in Brighton—that handle criminal and civil matters.  (*Id.* ¶¶ 2-3).

#### 2.    Alleged Hostile Work Environment

##### a.    Employment Overview

On July 3, 2020, Nakanwagi applied for a Head Account Clerk ("HAC") position at the Brighton Division of the BMC.  (*Id.* ¶ 6).  On March 15, 2021, Eric Donovan, the Clerk Magistrate who oversaw court operations, recommended her for the position.  (*Id.* ¶¶ 4-6).  She was hired on April 12, 2021.  (*Id.* ¶ 7).

As HAC, Nakanwagi was responsible for handling, processing, and accounting for the money collected and disbursed by the court, including restitution and probation fees.  (*Id.* ¶ 7).  Because she was in a position covered by a collective-bargaining agreement, she was subject to a nine-month probationary period.  (*Id.*).

At work, Nakanwagi was directly supervised and trained by three other clerical court

staff members:  Paula Woodley, the Office Manager; Ramesh Singh, the Operations Supervisor; and Susan Tolman, the Case Coordinator.  (*Id.* ¶ 5).  Woodley, who is a black female, had worked at the Executive Office for approximately 23 years.  (*Id.* ¶ 8).  Singh, who is Indian-American, had worked at the Executive Office for 34 years.  (*Id.*).  And Tolman, who is a white female, had worked at the Executive Office for 14 years.  (*Id.*).

Woodley, Singh, and Tolman took turns training Nakanwagi on office protocols and HAC-related duties.  (*Id.* ¶ 10).  On multiple occasions, however, they reported that Nakanwagi refused to comply with office policies and that she routinely expressed her disapproval of various job requirements.  (*Id.*).  For example, she shared confidential information concerning a restraining order over the telephone, in violation of an office policy that such information only be shared in person after verifying photo identification.  (Woodley Aff. ¶ 10).  After her colleagues explained that the policy was designed to protect the safety of the parties subject to the restraining order, Nakanwagi expressed her disapproval of the policy rather than agreeing to comply with it going forward.  (*Id.*).  She was then temporarily removed from phone-related duties.  (*Id.*).

At other times, in violation of established policies, Nakanwagi offered legal advice to a court user and opened mail addressed to a judge.  (*Id.* ¶¶ 11-12).  When informed that she was failing to abide by the office policies, she vigorously and persistently argued that she did not agree with them.  Clerk Magistrate Donovan eventually intervened and informed Nakanwagi that her repeated and protracted argumentation was causing discomfort to other staff members and interfering with her work performance.  (*Id.* ¶¶ 10, 12; Donovan Aff. ¶ 11).

Separately, shortly after starting her job, Nakanwagi informed her colleagues that she had recently moved from Arizona and was living in transitional housing.  (Woodley Aff. ¶ 5).

Woodley offered to put her in touch with her landlord to inquire about available rental properties. (*Id.*). Woodley also offered to introduce Nakanwagi to a member of the court security staff who could provide her with transportation. (*Id.*). Nakanwagi accepted both offers of assistance. (*Id.*).

Moreover, the clerical staff had a practice of purchasing lunch for the office every Friday. (*Id.* ¶ 7). Although staff members would rotate each week to purchase the lunches for the group, they never required Nakanwagi to take a turn paying due to her "difficult personal circumstances." (*Id.*). To further accommodate Nakanwagi's adjustment to the job, Woodley also permitted her to take breaks during work hours so that she could participate in video hearings related to personal litigation matters in Arizona. (*Id.* ¶ 8).

In addition, after noticing that Nakanwagi wore wigs to work, Woodley—who had previously worn wigs herself but had recently decided to donate them—offered to give her wigs to her. (*Id.* ¶ 6). Nakanwagi accepted the wigs from Woodley. (*Id.*). Woodley asserts that she offered the wigs to Nakanwagi only because she sought to "aid a less fortunate person." (*Id.* ¶ 6). She further asserts that as a heterosexual woman, she had no sexual interest in Nakanwagi and never had any sexual objectives in her interactions with her. (*Id.* ¶ 2).

### b.     June 16, 2021 Workplace Incident

On June 16, 2021, a white male named Patrick Doyle entered the Brighton Division courthouse and requested help addressing an issue with a warrant. (Tolman Aff. ¶ 2). Tolman verified his identification and provided the necessary paperwork to Clerk Magistrate Donovan for his review and execution. (Tolman Aff. ¶ 3).

Before Clerk Magistrate Donovan had finalized the paperwork, Doyle requested that Tolman permit him to pay the requisite fee for the warrant matter. (Tolman Aff. ¶ 3). However, without the completed forms from Clerk Magistrate Donovan—who was, at the time, overseeing

an ongoing court session—Tolman was unable to verify the fee total, and therefore asked Doyle to wait for the files to be returned so that she could properly process the transaction.  (*Id.* ¶ 4).

Nakanwagi disagreed with Tolman's handling of the situation and told her and Woodley that they were not adequately helping Doyle.  (Woodley Aff. ¶ 13).  She insisted that they take payment from Doyle immediately because he was a single father with family obligations.  (*Id.* ¶¶ 13-14).  Woodley reminded her that they were not permitted to interrupt court proceedings to retrieve files from Clerk Magistrate Donovan.  (*Id.* ¶ 14).  The delay caused Doyle to become increasingly agitated.  (*Id.*).

Eventually, Tolman was permitted to enter the courtroom to retrieve Doyle's completed files so she could verify the payment amount.  (Tolman Aff. ¶ 6).  Doyle then presented a credit card with a name that was not his, and Tolman informed him that she could not accept a card with another person's name on it.  (*Id.*).  He stated that the card belonged to his wife.  (*Id.*).  Tolman requested that he either ask his wife to come to the court to make the payment or that he use a different method of payment.  (*Id.*).  Doyle angrily yelled at Tolman, Woodley, and the other staff members, accusing them of being rude and unhelpful, before running out of the building.  (*Id.* ¶ 7; Woodley Aff. ¶ 15).

Woodley and Nakanwagi both approached Clerk Magistrate Donovan upon his return from the courtroom and provided their accounts of the events involving Doyle.  (Donovan Aff. ¶ 12).  Clerk Magistrate Donovan directed them both to prepare and submit incident reports. (*Id.*).

Nakanwagi's report, submitted four days later on June 20, 2021, contained comments about "black Americans" that caused Clerk Magistrate Donovan to be apprehensive about her continued employment at the Brighton court.  (*Id.* ¶ 13).

Three comments in particular concerned Clerk Magistrate Donovan.  The first comment read, "How will other races know how to treat black people with dignity, when black Americans are hostile, mean, harass, and bully those who share their skin color . . . ."  (*Id.*).  The second comment read, "Why won't marginalized court users . . . teach their offspring that black people are dangerous (not safe to be around) . . . [?]"  (*Id.*).  The third comment read, "They[](black Americans) beat me too much, I 'reached death's door' . . . ."  (*Id.*).

Clerk Magistrate Donovan understood Nakanwagi to be expressing a belief that the treatment of Doyle by Woodley—who, again, is African-American—was representative of, or attributable to, all black people.  (*Id.* ¶ 14).  In light of her comments in her incident report and the several complaints about her persistent refusal to follow the office policies, Clerk Magistrate Donovan concluded that her employment should be terminated.  (*Id.*).

However, shortly after reaching that conclusion, he learned that Nakanwagi had filed a complaint with the Office of Workplace Rights and Compliance ("OWRC").  (*Id.* ¶ 15; *see* Soto Aff. Ex. A).  He decided to wait until the investigation ended before terminating her employment.  (Donovan Aff. ¶ 15).  He then placed her on administrative leave starting on June 25, 2021, to minimize the possibility of any further conflicts with her colleagues.  (*Id.*).  Nakanwagi did not lose any compensation and continued to accrue benefits while on administrative leave.  (*Id.*).

### c.    OWRC Investigation

The OWRC is an office within the Executive Office of the Trial Court that conducts internal investigations related to complaints of discrimination, harassment, and retaliation in order to remedy any such violations and prevent future occurrences.  (Soto Aff. ¶ 2).  Nakanwagi filed a complaint with OWRC on June 17, 2021, alleging that Woodley harassed her based on her sex and national origin.  (*Id.* ¶ 3).  On June 30, 2021, she separately filed a complaint with

the Equal Employment Opportunity Commission ("EEOC") and the Massachusetts Commission Against Discrimination ("MCAD"), similarly alleging discrimination based on her sex and national origin, and also alleging retaliation for raising a complaint. (ECF No. 12-2).

Danny Soto, an OWRC manager, conducted an investigation into Nakanwagi's internal complaints. (Soto Aff. ¶ 3). Between June 25 and July 23, 2021, he interviewed Nakanwagi, Woodley, and two other office employees, and reviewed documents relevant to the complaint. (*Id.*; *see* Soto Aff. Ex. A at 2).

During Nakanwagi's interview with Soto, she made several assertions that, after collecting and considering the facts, Soto found to be unsubstantiated. (Soto Aff. ¶ 5).[1] He concluded that the conflict between Nakanwagi and Woodley was work-related and did not stem from her Ugandan heritage. (*Id.*). He also concluded that her allegations of sexual harassment were not credible because (1) she materially misrepresented several of the alleged incidents of harassment in her complaint and interview and (2) she harbored animus toward black Americans. (*Id.*; Soto Aff. Ex. A at 15-16).

On August 27, 2021, Soto presented his final investigative report to Clerk Magistrate Donovan, who accepted the report's findings and conclusions. (Soto Aff. ¶ 4; Donovan Aff. ¶ 17). On September 3, 2021, Soto provided Nakanwagi with a summary of his report and closed the investigation. (Soto Aff. ¶ 6).

---

[1] For example, Nakanwagi asserted that she had been prohibited from answering the phone not because of her failure to follow office protocols, but "because of her accent." (Soto Aff. Ex. A at 1). She further asserted that Woodley gave her the wigs as an unsolicited romantic gesture and that Woodley would become "upset and start[] yelling" at her if she did not wear the wigs. (*Id.* at 2-3). And Nakanwagi alleged in her interview with Soto that Woodley had once "caressed" her shoulders. (*Id.* at 4). However, based on his review of the evidence, Soto did not find Nakanwagi's allegations in the OWRC investigation to be credible. (Soto Aff. ¶ 5). Nakanwagi did not submit an affidavit, evidence, or a concise statement of facts to contest Soto's findings or substantiate her allegations.

### d. **Nakanwagi's Termination**

Upon completion of the OWRC investigation, Clerk Magistrate Donovan decided to move forward with the process of terminating Nakanwagi's employment. (Donovan Aff. ¶ 17). On September 16, 2021, he gave her a Notice of Probationary Termination. (*Id.* ¶ 18). The notice set forth the reasons for her termination, including her failure to comply with office policies, her inability to effectively collaborate with colleagues, and her "written statements of bias" against black Americans. (*Id.* ¶¶ 18-20). It also stated that she "may have made false statements or intentionally omitted information about [her] prior employment, which, if true, would be separate grounds for termination during [her] probationary period." (*Id.* ¶ 21).

### B. **Procedural Background**

On March 9, 2023, Nakanwagi filed suit in this court, asserting 21 claims of workplace discrimination and harassment under state and federal law.[2] Defendant moved to dismiss the complaint on August 18, 2023. On January 3, 2024, the Court granted the motion in part and denied it in part, dismissing all claims except those brought under Title VII, 42 U.S.C. § 2000e, *et seq.*, asserting (1) a hostile-work-environment claim based on sexual harassment (Count 1) and national-origin discrimination (Count 2) and (2) a retaliation claim arising out of plaintiff's internal complaint (Count 3) and her EEOC complaint (Count 4).

Defendant has now moved for summary judgment, contending that there is insufficient evidence in the record to support the discrimination and retaliation claims. Nakanwagi failed to submit an opposition to the motion for summary judgment, despite the fact that she requested, and was granted, multiple extensions to the deadline by which an opposition was to be filed. She

---

[2] On June 30, 2021, Nakanwagi filed charges with the EEOC and MCAD. (ECF No. 12-2). On December 15, 2022, the EEOC granted her request to dismiss her charges so that she could pursue her claims in this court. (ECF No. 1-1).

has not filed any affidavits or otherwise disputed any of the evidence submitted by defendant.

## II.    <u>Standard of Review</u>

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). In evaluating a summary judgment motion, a court indulges all reasonable inferences in favor of the nonmoving party. *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotations omitted). The nonmoving party may not "rest upon mere allegation or denials of his pleading," but must "present affirmative evidence." *Id.* at 256-57. Indeed, under Local Rule 56.1, a party opposing a summary-judgment motion must "include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation." L.R. 56.1.

If the opposing party fails to meet a reasonable deadline to submit a concise statement of the contested material facts, the court may "treat the summary judgment motion as unopposed, and deem admitted all facts presented as uncontested by the movant." *Mouliert-Vidal v. Flores-Galarza*, 165 F. App'x 866, 871 (1st Cir. 2006); *see* L.R. 56.1 ("Material facts of record set forth

9

in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties.").

The court may not, however, simply grant the unopposed motion for summary judgment as a matter of course. *Aguiar-Carrasquillo v. Agosto-Alicea*, 445 F.3d 19, 25 (1st Cir. 2006). Rather, "the district court [is] still obliged to consider the motion on its merits, in light of the record as constituted, in order to determine whether judgment would be legally appropriate." *Id.* (quoting *Mullen v. St. Paul Fire and Marine Ins. Co.*, 972 F.2d 446, 452 (1st Cir. 1992)). Thus, before granting an unopposed summary-judgment motion, the court must "inquire whether the moving party has met its burden to demonstrate undisputed facts entitling it to summary judgment as a matter of law." *Id.* (quoting *López v. Corporación Azucarera de Puerto Rico*, 938 F.2d 1510, 1517 (1st Cir. 1991)).

## III.  Analysis

### A.  Hostile Work Environment

Plaintiff first asserts that she was subjected to a hostile work environment based on a pattern of sexual harassment and national-origin discrimination. Title VII prohibits an employer from discriminating against an employee based on her "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). It further prohibits an employer from requiring an employee "to work in a discriminatorily hostile or abusive environment." *Valentin-Almeyda v. Municipality of Aguadilla*, 447 F.3d 85, 94 (1st Cir. 2006) (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993)).

To succeed on her claim of hostile work environment, plaintiff must prove that (1) she is a member of a protected class; (2) she encountered unwelcome harassment; (3) the harassment was based on race, color, or national origin; (4) the harassment was sufficiently severe or

pervasive so as to alter the conditions of her employment and create an abusive work environment; (5) the conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive, and she perceived it to be so; and (6) a basis for employer liability has been established. *Id.* When evaluating hostile-work-environment claims, courts should "consider the totality of the circumstances in each case" and "avoid disaggregating [the] claim [by] dividing conduct into instances of sexually oriented conduct and instances of unequal treatment." *O'Rourke v. City of Providence*, 235 F.3d 713, 730 (1st Cir. 2001).

It is undisputed that plaintiff—a woman who is originally from Uganda—is a member of a protected class and therefore satisfies the first element of a hostile-work-environment claim. However, as to the remaining elements, the undisputed evidence indicates that Woodley did not subject plaintiff to any unwelcome harassment, let alone severe and unreasonable harassment, based on her membership in a protected class.

Unwelcome harassment includes both unsolicited conduct "motivated by sexual desire" and "differential treatment towards an employee" because of sex or national origin. *See Rigau v. Pfizer Caribbean Corp.*, 525 F. Supp. 2d 272, 283 (D.P.R. 2007). The factors that render such conduct impermissibly offensive include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating . . . ; and whether it unreasonably interferes with an employee's work performance." *O'Rourke*, 235 F.3d at 729.

Here, the record demonstrates that Woodley neither took a sexually motivated action toward plaintiff nor treated her differently based on her national origin. Rather, the undisputed evidence shows that Woodley extended offers of support to ease plaintiff's transition to her new job at the Executive Office. For example, Woodley offered to help her find permanent housing

11

and transportation; offered to permit plaintiff to handle personal matters while on the job; and offered to give plaintiff wigs that she no longer needed and was going to donate. (Woodley Aff. ¶¶ 5-6, 8). Plaintiff accepted each of those offers. Moreover, there is no genuine dispute that Woodley's actions were not motivated by either sexual desire or animus toward plaintiff's nationality. (*Id.* ¶¶ 2-3). Instead, she intended to help plaintiff because of her difficult circumstances at the time. (*Id.* ¶ 6). Her actions therefore do not constitute unwelcome harassment of any kind, let alone severe and unreasonable harassment.

It may be true that in her OWRC interview with Soto, plaintiff alleged that Woodley made unwelcome comments and gestures and gave unsolicited gifts to her. However, Soto found those allegations to be baseless and not credible because plaintiff had made material misrepresentations in her interview about the alleged incidents, and she had exhibited a persistent animus toward Woodley. In addition, none of the sworn statements in the evidentiary record corroborate the assertions that plaintiff made in her interview with Soto. More importantly, for present purposes, plaintiff has not presented any "affirmative evidence" to substantiate her allegations or to contest defendant's statement of the relevant events. *See Anderson*, 477 U.S. at 256-57. Indeed, because she failed to file an opposition motion or concise statement of material facts in response to the motion for summary judgment, under Local Rule 56.1, the material facts of record set forth by defendant are deemed to be admitted by her. *See* L.R. 56.1.

Thus, even viewing the undisputed record in the light most favorable to plaintiff, she was not subjected to unwelcome harassment by Woodley based on her sex or national origin. Summary judgment will therefore be granted in defendant's favor as to the hostile-work-environment claims in Counts 1 and 2.

## B.  <u>Retaliation</u>

Plaintiff next asserts that defendant retaliated against her by placing her on administrative

leave and then firing her for filing complaints internally and with the EEOC.  Title VII makes it

an unlawful act for an employer "to discriminate against any individual . . . because [s]he has

opposed any practice made an unlawful employment practice" under Title VII.  42 U.S.C.

§ 2000e-3(a).  To prove a claim of retaliation under Title VII, the plaintiff must demonstrate that

(1) she engaged in protected conduct, (2) the employer took an adverse employment action, and

(3) the protected conduct and the adverse action were causally linked.  *See Kinzer v. Whole

Foods Mkt.*, Inc., 99 F.4th 105, 115 (1st Cir. 2024).  Once the plaintiff establishes a *prima facie*

case of retaliation, "the burden shifts to the defendant to articulate a legitimate, non-retaliatory

explanation for its actions."  *Id.* (quoting *Planadeball v. Wyndham Vacation Resorts, Inc.*, 793

F.3d 169, 175 (1st Cir. 2015)).  If the defendant meets its burden, then "the plaintiff [must] show

that the defendant's explanation is a pretext for unlawful retaliation."  *Id.*

### 1.    *Prima Facie* **Case**

#### a.    **Termination**

Defendant does not dispute that plaintiff engaged in protected activity by filing the

OWRC and EEOC complaints.  Nor does it dispute that its termination of plaintiff's employment

constituted an adverse employment action.  However, it contends that the decision to terminate

plaintiff was not causally linked to her protected activity, because the undisputed evidence

establishes that Clerk Magistrate Donovan decided to fire plaintiff *before* he learned that she had

filed those complaints.  (Donovan Aff. ¶¶ 14-15).

"[T]o successfully establish a claim of unlawful retaliation there must be, 'at a

minimum, . . . competent evidence that the alleged retaliators *knew* of the plaintiff's protected

activity and that a retaliatory motive played a part in the adverse employment actions alleged."

*Alvarado v. Donahoe*, 687 F.3d 453, 459 (1st Cir. 2012) (quoting *Lewis v. Gillette Co.*, 22 F.3d

22, 24 (1st Cir. 1994)) (emphasis in original).  Indeed, "if a supervisor . . . is unaware of the fact

that a plaintiff engaged in protected conduct, any actions attributable to him could not plausibly have been induced by retaliatory motives." *Id.* Because the undisputed record shows that Clerk Magistrate Donovan decided to fire plaintiff before he learned about her OWRC and EEOC complaints, defendant asserts that the retaliation claim with respect to her termination must fail as a matter of law.

However, it is also undisputed that Clerk Magistrate Donovan's decision to fire plaintiff post-dated—and indeed, was motivated in part by—his review of her incident report concerning the June 16, 2021 encounter with Doyle. That report not only contains plaintiff's rendition of the relevant events, but it also alleges discrimination and harassment by Woodley. "When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication *virtually always* constitutes the employee's opposition to the activity," and therefore constitutes protected activity. *Kinzer*, 99 F.4th at 115-16 (quoting *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276-78 (2009)) (emphasis in original). The category of protected activity "sweeps . . . broadly" and includes "responding to an employer's inquiries about inappropriate behavior[.]" *Id.* at 116 (quoting *Ray v. Ropes & Gray LLP*, 799 F.3d 99, 111 (1st Cir. 2015)).

Here, plaintiff's incident report includes complaints about Woodley's workplace conduct. Regardless of the truth of those complaints, they fall within the range of communications that "protest[] an employer's allegedly unlawful actions" and may therefore constitute protected activity. *Id.* It is undisputed that Clerk Magistrate Donovan's decision to terminate plaintiff was made after, and influenced by, the review of her incident report, and therefore the adverse employment action could be found to be causally linked, at least in part, to the complaints listed in the report.

Defendant contends that the incident report as a whole cannot constitute legitimate protected activity because it contains "inflammatory and racist content." (Mot. Summ. J. at 18 n.5). In support of its position, defendant cites two cases for the proposition that "otherwise protected conduct may be so disruptive or inappropriate as to fall outside [Title VII's] protection." *Rollins v. State of Fla. Dep't of L. Enf't*, 868 F.2d 397, 401 (11th Cir. 1989); *Robbins v. Jefferson Cnty. Sch. Dist. R-1*, 186 F.3d 1253, 1259-60 (10th Cir. 1999) (holding that an employee's manner of pursuing a grievance must be reasonable in order to warrant Title VII protection). In essence, the cases hold that when a plaintiff "lodge[s] frequent, voluminous, and sometimes specious complaints and engage[s] in antagonistic behavior toward her superiors," the plaintiff's conduct is not protected activity. *Robbins*, 186 F.3d at 1259.

The incident report certainly contains racially inflammatory comments that would raise a concern with any reasonable supervisor. Surely, if the same comments had been made across racial boundaries—that is, for example, if a white employee had written that court users should "teach their offspring that black people are dangerous (not safe to be around)"—that would constitute a valid basis for immediate termination. It is unclear why the analysis should be any different because plaintiff is a woman from Uganda. Arguably, therefore, the incident report does not constitute legitimate protected conduct.

Because, however, plaintiff cannot establish that her termination was pretextual—as required at the third stage of the analysis—it is unnecessary to decide the issue. In other words, while it is highly doubtful that plaintiff has met her burden to establish that she engaged in legitimate protected conduct, for present purposes the Court will assume that she did so, because her claim fails for other reasons.

**b.     <u>Administrative Leave</u>**

Before her termination, but after the filing of her internal complaint, plaintiff was placed

on paid administrative leave for approximately three months during the pendency of the OWRC investigation.  Defendant contends that the decision to place plaintiff on temporary administrative leave was not an adverse employment action because it was not disciplinary and did not affect plaintiff's compensation or benefits.  (Mot. Summ. J. at 18 n.4).

Under Title VII, an adverse employment action must be "materially adverse"—that is, the action must be of the kind that "might have dissuaded a reasonable worker from [engaging in protected activity]."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57, 67-68 (2006); *see Booker v. Massachusetts Dept. of Public Health*, 612 F.3d 34, 43 (1st Cir. 2010).  Typical examples of adverse employment actions include "tak[ing] something of consequence from the employee, [such as] by discharging or demoting her, reducing her salary, or divesting her of significant responsibilities."  *Blackie v. State of Me.*, 75 F.3d 716, 725 (1st Cir. 1996).  Whether a challenged action is materially adverse is "an objective test and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'"  *Lockridge v. Univ. of Me. Sys.*, 597 F.3d 464, 472 (1st Cir. 2010) (quoting *White*, 548 U.S. at 57).

The First Circuit has not decided whether paid administrative leave automatically constitutes an adverse employment action, and other circuit courts that have considered the issue have reached different conclusions.  *Compare Joseph v. Leavitt*, 465 F.3d 87, 90-91 (2d Cir. 2006) (collecting opinions of the Fourth, Fifth, Sixth, and Eighth Circuits and agreeing with their holdings that "administrative leave with pay during the pendency of an investigation does not, without more, constitute an adverse employment action"), *with Dahlia v. Rodriguez*, 735 F.3d 1060, 1078 (9th Cir. 2013) (en banc) (holding that placement on administrative leave can constitute an adverse employment action for purposes of a First Amendment retaliation claim);

*see also United States ex rel. Herman v. Coloplast Corp.*, 295 F. Supp. 3d 37, 43 (D. Mass. 2018) (holding that at the summary-judgment stage, a jury could reasonably conclude that a year-long paid administrative leave constituted an adverse employment action because it prevented the plaintiff from "grow[ing] herself professionally").

The Court will again assume, without deciding, that a reasonable employee in plaintiff's position would consider being placed on administrative leave as an adverse employment action. *See Dilettoso v. Potter*, 2006 WL 197146, at *8 (D. Ariz. Jan. 25, 2006) (stating that "[a]lthough administrative leave with pay may be welcomed by some, the threat of forced leave could reasonably deter employees who prefer working from engaging in protected activity").

Thus, and with the two assumptions that (1) plaintiff engaged in legitimate protected conduct and (2) she suffered an adverse employment action by being placed on administrative leave, the Court will assume that plaintiff has met her burden to establish a *prima facie* case of retaliation under Title VII.

## 2.    Defendant's Non-Discriminatory Justification

The burden thus shifts to defendant to "articulate a legitimate, non-retaliatory explanation for its actions." *Kinzer*, 99 F.4th at 115. One permissible reason to terminate an employee is that she "consistently fails to comply with the duties and objectives of [her] position." *See Acevedo-Parrilla v. Novartis Ex-Lax, Inc.*, 696 F.3d 128, 140 (1st Cir. 2012). An employee's expression of overt racial bias may also permissibly justify termination. *See O'Horo v. Boston Med. Ctr. Corp.*, 131 F.4th 1, 15 (1st Cir. 2025) (holding that an employer's "concern that [plaintiff] held biases against" a black colleague constituted a non-discriminatory explanation for taking an adverse employment action).

Here, defendant contends that it terminated plaintiff based on multiple legitimate and non-retaliatory reasons, including (1) her persistent refusal to follow office policies and

procedures and (2) her expression of racially biased views in her incident report. (Mot. Summ. J. at 20).[3] Defendant asserts that those reasons casted substantial doubt on plaintiff's ability to effectively work with her colleagues and court users. (*Id.*). Defendant also maintains that it placed plaintiff on administrative leave to allow for the OWRC investigation to "proceed without the possibility of any further conflicts between the employees," not because she expressed opposition to the office's employment practices. (Donovan Aff. ¶ 15).

Those reasons, on their face, are legitimate, non-discriminatory bases for taking the adverse employment actions at issue and are supported by the undisputed record. Defendant has therefore satisfied its burden.

### 3.   Pretextual Motive

At the third stage, "plaintiff can only avoid summary judgment by adducing sufficient evidence of pretext and retaliatory animus to make out a jury question . . . as to whether retaliation was the real motive underlying" her administrative leave and termination. *See Herman*, 295 F. Supp. 3d at 45 (quoting *United States ex rel. Hamrick v. GlaxoSmithKline LLC*, 814 F.3d 10, 18 (1st Cir. 2016)).

Plaintiff has entirely failed to meet that burden here. Nothing in the record suggests that defendant's reasons for terminating plaintiff or placing her on administrative leave are pretextual or based on retaliatory animus. She does not contest the evidence demonstrating that she

---

[3] Defendant also contends that it terminated plaintiff because she made "material misrepresentations and omissions in her employment application materials." (Mot. Summ. J. at 20). In the termination letter provided to plaintiff in September 2021, Clerk Magistrate Donovan noted that "it appears that [plaintiff] may have made false statements or intentionally omitted information about [her] prior employment, which, if true, would be separate grounds for termination during [her] probationary period." (Donovan Aff. ¶ 21). The letter does not suggest that defendant verified whether plaintiff had, in fact, made false statements on her application, but only that she "may have" done so. (*Id.*). The letter also does not state that plaintiff was terminated because of those supposed omissions, but rather that those omissions, "if true," would constitute a separate basis for termination—a basis that Clerk Magistrate Donovan did not rely upon in the termination letter itself. (*Id.* ¶ 20-21). Thus, even if defendant harbored concerns about plaintiff's job-application materials at the time of her termination, the evidence indicates that she was not terminated for that reason.

repeatedly failed to follow the office's policies.  Nor does she contest the evidence

demonstrating that she was unable to work effectively with her colleagues without conflict.  And

the fact that she made racially biased statements is undisputed; indeed, she made them in writing,

so her actual choice of words is not contested.

In short, plaintiff has not submitted any evidence that would cast doubt on defendant's

assertions that the decisions to place her on administrative leave and to terminate her were not

pretextual, and that they were not in retaliation for the complaints that she lodged in the

investigative report and the OWRC and EEOC filings.  And again, because she failed to file an

opposition motion or concise statement of material facts in response to the motion for summary

judgment, under Local Rule 56.1, the material facts of record set forth by defendant are deemed

to be admitted by her.  *See* L.R. 56.1.  The undisputed evidence, therefore, demonstrates that

defendant based its adverse employment decisions on legitimate, non-retaliatory factors.

Accordingly, plaintiff's retaliation claim fails as a matter of law, and summary judgment

will be entered in defendant's favor as to Counts 3 and 4.

## IV.    Conclusion

For the foregoing reasons, defendant's motion for summary judgment is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor, IV
Dated:  June 6, 2025                                Chief Judge, United States District Court